EBSARY FIREPROOFING AND GYPSUM COMPANY, Plaintiff, v. THE EMPIRE GYPSUM COMPANY, Defendant.

(Supreme Court, New York Special Term, February, 1920.)

Injunctions — when granted — contracts — negative covenants — damages.

> An agreement by defendant, the manufacturer of stucco calcined plaster, in a contract for the delivery of its products, that it will give priority, in respect of time of delivery, to orders of the plaintiff, which manufactures fireproof building blocks out of stucco calcined plaster, is in effect a negative covenant not to deliver to others until the requirements of the plaintiff as to deliveries have been met according to their contract, and if the defendant has violated its covenant, any future violation, in the absence of an adequate remedy of law, may be restrained by injunction.

> It clearly appearing that defendant's breach of said covenant was without sufficient excuse and has caused the plaintiff much damage, the greater part of which is not susceptible of proof, an injunction will be granted to restrain any further violation of the covenant and judgment given for such certain but inadequate damages as can be proved.

ACTION for an injunction.

Edo E. Mercelis (Franklin Nevins, of counsel), for plaintiff.

Werner & Harris (Abraham Benedict, of counsel), for defendant.

DAVIS, J. This action is brought for an injunction restraining defendant from delivering its product to others until it fulfills its contract to deliver those products to the plaintiff pursuant to the terms of its contract with plaintiff. The prayer for relief includes a demand for certain money damages. The original contract between the parties, which was dated May 1, 1911, was modified by a subsequent contract, in writing, containing the following provision: " This modification of the contract of May 1, 1911, is made by the said party of the first part (the defendant) upon the express conditions and · understanding that the party of the second part (the plaintiff) shall purchase from the party of the first part, during the period of the said contract, all stucco calcined plaster and retarded plaster required by it for use within the United States east of the western line of Pennsylvania and north of and including Richmond and Norfolk, *the party of the first part* (the defendant) *agreeing to give priority in respect of time of delivery to orders of the party of the second part.*" The plaintiff claims that the defendant's agreement to give it priority in delivery of material is a negative covenant on defendant's part not to deliver its product to others until the requirements of the plaintiff as to deliveries have been met according to their contract. And the plaintiff asks for a decree permanently restraining defendant from delivering or shipping its product to any of its customers until it shall have supplied the requirements of the plaintiff under its contract with defendant. There are other demands which will be referred to hereafter. I think the language of the contract is in effect a negative covenant. It is an agreement on the part of defendant not to deliver its product to others until it has met the requirements of the plaintiff. And if the defendant has violated this covenant,

18

its future violation can be prevented by injunction, if there appears to be no adequate remedy at law. *St. Regis Paper Co.* v. *Santa Clara Lumber Co.,* 173 N. Y. 149. The plaintiff manufactures fireproof building block out of stucco calcined plaster. It also uses these blocks in the construction of parts of buildings. It uses for the setting of these blocks a plaster manufactured by defendant known as retarded plaster. The plaintiff's plant is located at Garbutt, N. Y., on land owned by the defendant. The defendant's plant is also at Garbutt, where it manufactures stucco calcined plaster. On May 1, 1911, it entered into a written agreement and lease to restrain the breach of which this action is brought. At that time the defendant had a fully equipped plant in operation at Garbutt manufacturing and selling gypsum and its products and byproducts. The plaintiff had not yet erected its plant at that time. It did so later, after the execution of the contract. Both parties deemed it economically advantageous that plaintiff's plant should be in such close proximity to defendant's plant as to allow the defendant's product used by the plaintiff to be delivered into plaintiff's works by a conveyor. This fact appears in the following preamble in the contract: " Whereas both of the parties hereto deem it advantageous that the product of the party of the second part (the plaintiff) should be manufactured in close proximity to the manufacturing plant of the said party of the first part (the defendant) in order that transportation and other economies may be secured materially advantageous to them." The contract having been executed, the plaintiff began the building of its plant and expended nearly $30,000 for that purpose. The plaintiff's buildings were built on land leased to it by defendant and were linked to defendant's factory by a screw conveyor, through which the

material furnished by defendant and used by plaintiff
was conveyed to certain bins in plaintiff's factory,
where it was used as needed for making gypsum block.
The two plants were so near each other and so con-
nected and served by the same railroad sidings, that
from the photograph in evidence they appear like a
single plant.  Plaintiff's Exhibit B.  Recurring to the
contract of May 1, 1911, the defendant agreed to sell
and deliver to the plaintiff during the term of the
agreement (ten years, with privilege to the plaintiff
to extend it for five additional years) fifteen net tons
of stucco calcined plaster daily, except Sundays and
holidays, at the rate of two dollars and eighty-five
cents per net ton delivered in the bins of plaintiff.  It
was also agreed that plaintiff should have the option of
calling for thirty-five additional net tons daily at the
same rate, with the further option to purchase five
thousand additional tons yearly at three dollars per
net ton, "the intention being that the party of the
second part (the plaintiff here) shall purchase all
plaster required by it at Garbutt to the extent above
specified from the party of the first part."  There is
also a provision that plaintiff will purchase from
defendant all neat cement wall plaster required by it
at three dollars and fifty cents per net ton for two
years from June 1, 1911, and thereafter during the
term of the contract at the market price not exceeding
four dollars and fifty cents per net ton.  Then follow
provisions leasing the premises to plaintiff upon which
it agreed to erect, and did erect, its factory, the steam
power to run which was to be supplied from the plant of
defendant.  If the plaintiff exercised its option to
extend the term of the contract for the five years
beyond the ten years' period, it was to pay not less
than three dollars and ten cents and not more than
three dollars and twenty-five cents per net ton.  To

Supreme Court, February, 1920.      [Vol. 110.

perfect the arrangement the defendant executed a lease of the premises afterward occupied by plaintiff to the plaintiff for a term of ten years, with the privilege of extending the term for an additional five years. The contract of May 1, 1911, was modified by an agreement in writing on the 6th of December, 1915. The modification related to amounts and prices of the material to be supplied by defendant after January 1, 1916. Thus, for quantities of calcined plaster less than twenty-five tons daily plaintiff was to pay at the rate specified in the unmodified contract of May 1, 1911 (two dollars and eighty-five cents per net ton); for twenty-five tons daily, two dollars and sixty cents per net ton; for all stucco in excess of twenty-five tons daily, two dollars and fifteen cents per net ton, and for retarded plaster not more than three dollars and seventy-five cents per net ton for quantities less than ninety bags. After the execution of the modifying contract of December 6, 1915, plaintiff made important additions to its plant, costing about $15,000, and it is claimed that the plant as it now stands could not be constructed for less than $86,000, and this contention appears to me to have strong support in the evidence. On May 16, 1918, defendant notified the plaintiff that after May 31, 1918, it would not furnish calcined plaster according to the contracts of May 1, 1911, and December 6, 1915, at the prices agreed upon therein. This action on the part of the defendant led to a suit by plaintiff for an injunction. A temporary order was granted restraining defendant from making deliveries of its product to any of its customers until it had carried out the terms of its contract with plaintiff. Before the hearing of a motion to continue the temporary injunction the plaintiff withdrew the suit, the parties executing the following memorandum on June 11, 1918: *First.* Ebsary will pay two dollars and eighty-

five cents for stucco from June 1, 1918, until such time as it shall notify Empire of its election to return to the price named in the contracts now in force. *Second.* Payment of the increased price shall effect no modification of such contracts, which shall continue to be the measure of the obligation of the parties, except that Ebsary shall be obligated to pay the price named above for such deliveries as shall be made prior to its election to return to the contract prices. *Third.* Empire claims to payments in excess of contract price for materials delivered prior to June 1, 1918, to be waived. Notwithstanding the contract of May 1, 1911, and its modification of December 6, 1915, and the memorandum of June 11, 1918, the defendant on September 20, 1918, notified plaintiff that after October 1, 1918, it would deliver no material to plaintiff unless plaintiff would pay therefor four dollars per ton for stucco calcined plaster and five dollars per ton for retarded plaster. This action was begun November 16, 1918. From October 1, 1916, to said November 16, 1918, the defendant failed to make deliveries under the contract with the plaintiff. And this action is brought for an injunction as stated above, and for such certain but inadequate damages as can be proved. It is clear upon the evidence that the defendant committed a breach of its contract with the plaintiff and has shown no defense or sufficient excuse for it. It is also quite evident that this breach has caused the plaintiff very great damage, the greater part of which it will be impossible to estimate or prove. Relying upon the promises of the defendant the plaintiff erected an expensive plant in close association with that of the defendant. In effect the two plants were run together as one system. The situation of the plants was at a great distance from any other source of supply of material furnished to plaintiff by defendant. The

Supreme Court, February, 1920.          [Vol. 110.

plaintiff was unable to get material from other sources in quantities such as furnished by defendant. The amounts which it did obtain were insufficient to keep its plant busy, and it is now confronted with establish-ing its expensive plant in another locality, or remodel-ing it in a way to enable it to carry on its business independent of the defendant's plant and get its raw material from a distance at a greatly increased cost, unless the defendant is enjoined from violating its negative covenant not to sell its product to others until it fulfills its contract obligation to the plaintiff. Judg-ment for the plaintiff.

Judgment for plaintiff.